May it please the Court. Good morning, Your Honors. My name is Leticia Chavez-Farid, and I represent the appellant, Stephen Patrick Hardy. I would like to ask this Court for four minutes for rebuttal, please. All right. It's done. Your Honors, the issue before the Court comes down to exhaustion of the administrative remedies under the PLRA, which is a mandate of the PLRA. In this case, exhaustion comes down to a single word, available, specifically whether the administrative remedies at State Correctional Institution Camp Hill were available to Mr. Hardy. Well, let me ask you this. Go ahead. Let me ask you this question. On appellate review, there seems to be a fact that is critical, the form acknowledging receipt of the handbook. Is that form dispositive on the issue of availability, unavailability? It's not, Your Honor. Mr. Hardy... So what's the import of the fact that it's there, and the other facts that have come out with regard to his knowledge of process and handbook? So with regards to the handbook, Mr. Hardy didn't come into the prison like a standard, regular prisoner. He's an amputee, and he was ushered within hours to the infirmary. The infirmary, at the exhaustion hearing, he testified to the fact that for 30 days, you're not allowed belongings, like personal belongings. He signed that slip along with Priya's stuff, and it's in the transcript. And they told him that they would put the book in a box, and he would get it when he was returned to the block from the infirmary. So seven days later, he goes there. There's no book, and even the signed sheet, the signed document that he had signed is not there either. Right. We're familiar with the facts. Okay. And I think that the question that's being put to you is, if that's not dispositive, if the fact that he wrote, I got this, isn't dispositive of whether or not he got notice, and much of your argument seems to hinge on the assertion that without that handbook, the process wasn't really available to him, right? Maybe I've misunderstood your argument, but I thought a foundation of your argument was, without having the handbook, and without having a copy of DCADM 804, you can't really say that the grievance process was available, right? Because he doesn't know. That's a portion of the argument, but that's not the argument itself. The strongest argument is that he was given misinformation that he relied on to his detriment. Even if, I thought even that information, or that argument was dependent in the first instance on the assertion that he didn't otherwise know. He didn't have access to the information. Absolutely. Okay. So if your argument is, he didn't have access to the information, and the signed form saying he did have access to it is not dispositive, then the question becomes, do we have an open fact issue where summary judgment was inappropriate? In other words, your argument seems to be, we win because he didn't get this, but do you win not in the sense of winning at all, but win in the sense of it going back because there's an open fact issue left? Did he or did he not have access to the information? I don't think there is an open fact issue, Your Honor. I mean, we spent significant time in that exhaustion hearing. I don't know what more could be gained from going back. How about a ruling from the court, which we don't have? Because when we read the court's opinion, the court says on page eight, this is appendix page 10, even if the prisoner does not receive a handbook, et cetera, and then on the next page it said, regardless of his actual receipt of the grievance handbook, there's no place where the district court makes a ruling and says he got it or he didn't get it. That's what district courts do. They take disputes and they solve the dispute by saying, on balance, here's what I think the evidence shows. This is the historical fact as I find it, and there doesn't appear to be that fact finding in this record. Am I wrong about that? Well, if you look at appendix 11, the district court says, moreover, despite having alleged, and this is under number two, thwarting of grievances in district court's decision, moreover, despite having alleged that two correction officers refused to give him forms, his testimony revealed that the officers told him that the infirmary was out of the grievance forms, not that the officer refused to give him any forms. Hardy never had any trouble getting writing materials or paper during that time. Further, Hardy testified that he was told by his counselor, Ms. Perry, to fill out another one and send it in. I think you're misapprehending our point, at least on my behalf, but forgive me for that. Let me be a little more clear. The question is, the handbook issue is a predicate for the other questions, right? Because if you say that he's been misrepresented on certain issues, but there's evidence in the record that he has the handbook, he has access to the grievance process, he has knowledge of the grievance process, then the misrepresentation doesn't seem as strong, right? So we have to start with the first question, which is, if he signs and says he received the handbook and there's other evidence in the record of him being knowledgeable of the process, then you look through a different prism at your misrepresentation argument. So that's why I think Judge Jordan spent some time on the question of whether the record as it stands now creates a genuine dispute, because this issue has to be resolved before you can get to that issue. Now, if you say that the fact that he signed the form that says he received the handbook isn't dispositive of availability, then that's why I think we're focused on this. Right, that's the point. You've read us things about other stuff, grievance forms, accessibility paper, et cetera, but that's not really answering the question. The question is, do we not have an open factual issue about whether or not he actually got the handbook? You say he didn't, they say he did, there's some evidence on both sides, and I can't find, and maybe you can direct me to a place if I've missed it, I can't find a place in the record where the district court said, yeah, he got it, or no, he didn't get it. They seem to say, you know what, regardless of whether he got it, et cetera. But that regardless doesn't answer the question, it just sidesteps it. Do you understand what I'm trying to ask you? I do understand what you're saying. Yeah, and I'm thinking about... Is there a place in the record where it's resolved? There's not. You know, there was significant time during the exhaustion hearing that was spent on, he got the book, look, he signed for the book. But then when the opinion came out, it was, doesn't matter if he got the book or not. It's not dispositive as to whether or not he knew the grievance system. If we agree that that is a critical fact and it remains an open disputed fact, then is Judge Jordan right that the remedy would need to be sending it back for further fact finding? Do you agree with that? I do. But I do believe that there's case law that says even if the person does not have the book itself, the handbook, that that's not necessarily dispositive. It may not be. It's not a question of whether that answers the whole question. It is whether that's a crucial fact issue that has to be resolved, right? It's not that answering that question will resolve the whole case, but answering that question is important, indeed, maybe critical to resolving the whole case, isn't it? Because the whole case resolves around whether he had a grievance process truly available to him, right? Okay. So when you say on page 25 of your opening brief, and you do say this, that, oh, excuse me, it's on page 23, the district court's finding that Hardy received the handbook because he signed an acknowledgement form was clearly erroneous. I mean, that's why I'm spending time on this. I didn't see where the district court did make that finding. And now I hear you say they didn't. Have I got you right? Yeah, that must have been an error in my brief. All right. Counsel, should we read in? The district court did make a finding that he was aware of the grievance policy generally, right? Should we read into that a finding that the grievance policy includes appeal process? No. So within the prison handbook itself, there's two pages on the grievance system, including appeals. Mr. Hardy never got the book that's our position. Now, ADM 804 is only given to staff. And that is a more than 30-page document on the appeals process, et cetera. Can I ask you a question right now in the few seconds you've got left? And this is just a matter of curiosity. Why is it that Mr. Hardy isn't filing this grievance anew right now? There's nothing that says he can't file it now, right? There's no sort of race judicata thing that stops him from filing a grievance now to cover this. Is there a statute of limitations issue? Is there another reason why there wouldn't be a foundation for Mr. Hardy to say, well, okay, if you think I didn't exhaust before, I think I did, and I can pursue those arguments in court, but belt and suspenders, I'm filing my grievance now. There is. I mean, so there's all these time limits within the third tier system. And another portion of my argument really had to do with opacity. When we look at the grievances, because he learns of the grievance system, but he doesn't learn about the appeals. He learns about it in medical. So he starts filing them. He gets them back. One time he says, I'm getting really depressed. There's a lot of pain in my body. He gets it sent back. Well, those are two separate events, mental health and physical health. They have to be separately filed. On and on. That's understood. That's understood. But since the argument that the state is making and the medical defendants are making is that you didn't exhaust, does your client lose anything from pursuing a grievance now and appealing and exhausting? I think that he would under just the administrative process itself. You have to file within 15 days of the occurrence of the incident. Weren't several when he did break it down into individual incidents and filed additional multiple grievances, were those then rejected? They were rejected. As out of time? They were rejected because they were out of time, yes. But they were never taken through the full appeals process, right? They were not. And since their primary argument today is not, hey, as a matter of law, you don't have any claim because your claim is bad. Their argument is, as a matter of law, you don't have any claim because you didn't exhaust. Could you still exhaust? I believe that he's attempting to exhaust. He's been in the hole for a very long time. And we've heard that his grievances are not getting out. So you think he's trying to file now, but he's being put out? Yes, he sent them to my office, different copies and stuff that he's made. But I don't think they're getting through his process. Let me, let me ask you this question. Is, is what we're talking about with regard to the advice that he, that he received from the Counselor Perry, is that really a misrepresentation or is it an omission? In the sense that she didn't tell him, you know, she said, just file another grievance. You know, in Brown, our case in Brown, that's, that's a true misrepresentation. And we came out the way we did, I think, based, based on that. This seems to be distinct from a misrepresentation. And frankly, it seems more akin to an omission. Why should we interpret it as we did in Brown as a misrepresentation? Because Mr. Hardy followed Counselor Perry's instructions to his detriment. All he wanted was help. He followed those instructions to his detriment. Further, ADM 804, their own policy, says that counselors should know the policy because sometimes they're involved within the grievance process. He followed it to his own detriment. And, and Brown v. Croke, it says more. It says prisoners are entitled to rely on instructions by prison staff, even if they are at odds with the grievance policy. And such instructions may render the grievance procedure unavailable. Well, if we, if there were a finding, and that's certainly open to question, but if there were a finding that he had the grievance policy available to him and he did have the handbook, would that inform the answer to that question? I don't think so. I don't think so. I think that he had every right to go to his counselor and say, I'm getting all of these, these rejections, what do I do? And she said, file another one, send it in. And he did that. But counsel, if we afford to import a standard for exhaustion in this area, like we did in Rinaldi, that has an objective component and a subjective component, right? If, if an inmate receives the handbook and therefore has access to information about the appeal, then that would take care of the objective one, right? Absolutely. And the, the, the subjective one, we talked about in Rinaldi, whether it was actual knowledge or should have known. And again, having received the handbook, if he did, that, that could be dispositive, right? Right. And also the exhaustion hearing, I mean, on that signed document, they know who signed it. You know, they didn't produce an affidavit afterwards. They didn't bring that person to the exhaustion hearing to say, yeah, I gave him that book. None of that happened. And I, I don't know that it would if you sent it back as it is. Well, let me ask you one last question, if I might. There's some points in the briefing, it said that he filed 12 separate grievances and other points, it seems to be saying he's filed 11 separate grievances. How many grievances did he file? I think it was a total of 16. And I believe there's a footnote in there where the grievance officer says that she has lost some of them. So I got another number. It's 16. Okay. All right. Always at the first tier, though, Your Honor, always at the first tier, never knowing at the multi-tiered system. All right. We'll have you back on your wellness from Mr. Hopkirk. May it please the court. My name is Howard Hopkirk. I'm a senior deputy attorney general with the Pennsylvania Office of Attorney General. I am representing the Pennsylvania Department of Corrections in this appeal. I will be using eight minutes of the appellee's time. Arguing on behalf of the other appellees is Emily Ryan Fiore of the Pittsburgh law firm of Weber Gallagher. All right. Can you go straight to the issue, the fact issue, which we were talking with your learned opponent about? What are we to do? Is there a fact finding in this record with respect to whether Mr. Hardy got the handbook or not? So although the magistrate judge seemed to suggest that she didn't believe Mr. Hardy that he didn't receive the handbook, at the same time, it's murky. So our position is even if you put that aside, his actions still did not meet the requirements of exhaustion. But if... How can we put it aside? How can we put it aside if the question is availability of the grievance process and the very document that would explain to him the grievance process was never in his hands? So if you assume he never received the handbook, we believe there's still other evidence that shows he was generally aware of the grievance process and he had the opportunity... Because he filed grievances. Because in your briefing, that's all you say is, look, he filed grievances, so he must have known. Well, I mean, first, when he was signed off on having received the handbook, that was some notice that there was this grievance process. And then also... Okay, but I got to set that aside, right? Unless you're prepared to tell us, wait, there is a definitive ruling in the record that he got the handbook, because I'll repeat, I haven't found it and I haven't heard you point us to it. So set the handbook aside. What else is there that makes you say, oh, he understood the grievance process in its fullness? Not the fact that he could file a form, but that after filing the form, he had to take certain steps to exhaust. The grievance forms referenced the grievance procedure, which he could have taken. He could have gone to the library. The grievance procedures were also available on cell blocks. Mr. Hopkirk, isn't it the case, as the plaintiff's lawyer points out, says, all the grievance form does is reference that ADM form, which the prisoners don't have. They don't have it. Now, maybe there's a copy in the library, but the prisoners don't have it. Is that an accurate statement? That's accurate, but it's not accurate that they couldn't obtain it. And they could obtain it by... If you read the grievance form and you saw, hey, there's a reference to ADM, what is it, 840, 340? I can't remember. 804. 804. Oh, and therefore, I should go to the library and look it up. That's your argument, that the reference to ADM 804 tells you that's a form I have to see, and that's enough to make it available. That's the Pennsylvania argument. I mean, that is our argument. If that's your argument, then you essentially eviscerate the handbook requirement, right? Because in every case, what you'll say is court or discerning of deciding authority, the handbook's irrelevant, because this person filed a grievance form at some point and is generally aware that there's a grievance policy somewhere in the library. So we should impute that to them, and the handbook stuff really doesn't matter. That sounds like what your argument is. I mean, we're saying it doesn't have to matter. If the court disagrees with, you know, that there isn't enough without the handbook, then I would agree it should be sent back to the district court to make a more dispositive finding on whether or not he actually received the handbook or not. So you believe that there is a question of fact on whether or not he received the handbook? Yeah, I do believe there's a question of fact there, and the magistrate judge did not really sufficiently answer it. Okay, so your position is it should go back then? Well, our first position is even if you assume he didn't get the handbook, the totality of the circumstances, I'm sorry. The totality of the circumstances? That what was available to him, he could have found the appeals process and could have followed it, and the burden is on him. It's not a, you know, you asked one person, and maybe there was miscommunication, and so. Counsel, it's undisputed that he tried twice to go to the library, right? Well, he did, he tried to sign up twice, yes, but I don't think that that was a, you know, much of a try. It's not a good faith effort to go twice and be turned down. And I also would say the fact that there were policies available on cell blocks, and he didn't seem to. When you say policies available on cell block, I'm not sure I understand. Are you saying, what, these are generally available that the so-called jailhouse lawyers have it, so he could have asked around, and somebody's got it? No, that the corrections officials would have available on all cell blocks. Corrections official, he asked the corrections official, and he was told, yeah, file another grievance. And what I'd say is, I mean, that was, the magistrate judge didn't think that was an intentional misrepresentation by the counselor. The magistrate judge said that in response to the assertion that the Commonwealth is making, is that you could ask a, you could ask one of the corrections officials, he did that, and the response wasn't, well, here's ADM 804, it's, hey, file another grievance, right? I'm not sure which specific instance you're talking about, but. I'm talking about the specific circumstance that you yourself were referencing when you mentioned what the magistrate judge held. He was, he asked a person, I think it was an individual named Perry. Yeah. And Perry didn't say, oh, well, here's ADM 804, or, oh, you need to file an appeal. It was, file another grievance, file another one. And what I'm saying is, if you look at Rinaldi, that, what the magistrate judge said, well, if this had been an intentional misrepresentation to Mr. Hardy, then. Leave aside whether it's an intentional misrepresentation. I'm pursuing your own point, your assertion that this is available on the cell block. You just have to ask an employee of the prison. He did that. He wasn't given it. He was told, went to an employee and said, I don't know what to do next. And the answer wasn't, oh, well, here's ADM 804, or you should file an appeal. It was, file another one. So, by even your terms, he did what you're suggesting by going and asking somebody, and he was not told, here's the appeals process. He was told, file another grievance. So, how does that help your argument that this is freely available information? The record here indicates it wasn't freely available. And indeed, that he was misdirected, even if it wasn't a, quote, clear misrepresentation. So, it doesn't help my argument. But I would just direct the court to the case law on, you know, that it has to be a misrepresentation or the process has to be so opaque that the prisoner can't understand. What's the distinction you're drawing between what happened in Brown and this case? Right? I mean, in essence, what Counselor Perry said was a misrepresentation, right? It was not correct. And certainly, we should impute knowledge for the fallacy to her, right? Yeah. So, what's the distinction that you would draw between Brown and what we have here? Well, I would just say that the magistrate judge heard the testimony of Mr. Hardy and was not convinced that it was the type of intentional action by the department, which would warrant, you know, waiving the exhaustion. I get that, but that wasn't my question, right? My question is, what's the distinction that you're drawing between the factual scenario in Brown and this case? In Brown, we said it was a misrepresentation. I think they said, you know, basically sit tight and wait for the investigation to be over, if I recall. What's the distinction that should be drawn between that, on the one hand, and what Perry did here? Well, I think in telling the prisoner that they should just hold tight, that the investigation would be over, would clearly put them outside the period in which to comply with the exhaustion requirements. Whereas it's not so clear here. And it's not clear that Perry's advice is incorrect? Well, it's not entirely clear that what she told him was incorrect, because as the magistrate judge found, you can file appeals on using grievance forms as long as you note that they are, you know, appeal from the previous grievance. How was anything that Perry said, even by implication, a statement that you need to appeal? There, yeah, you've rightly pointed to something the magistrate judge said, but it's a puzzling thing, because it doesn't seem to speak to the facts in any way, because there wasn't a statement that you should appeal and you can use the same form, or appeal is the next step, or any reference in any way at all to appeal, it was, quote, file another one. He says, I'm filing grievances, nothing's working, file another one. Is that not just in ordinary parlance that anybody would understand an assertion not to appeal, but file another grievance? I agree, it seems highly problematic, but at the same time, it's a highly deferential standard to the magistrate judge. It may be deferential, but it's not a rubber stamp, and you get to a point, I'd like to get to in a minute, which is what's our standard of review, but these facts are profoundly troubling. I mean, here's a person with an obvious medical issue, and if I read the record correctly, a grievance officer who does handle appeals, a Michael Bell, later looked at Tonya Heist's series of rejections, and said, I don't agree with them, they're not right. She did it wrong, and she didn't just do it wrong once or twice, she did it wrong over, and over, and over, and over, and over again. I mean, the Kafkaesque description provided by the plaintiff is genuinely troubling, where you file an appeal, and it's rejected because you put two things in, and then you file the two separate ones, and it's rejected for being duplicative. And the DOC's own person in reviewing it says, well, those aren't right, I wouldn't have done that. I mean, I understand you've got a legal position that you're resting on, which is no exhaustion, but if you just dig slightly under that legal position, isn't the Department of Corrections in a world of hurt when its own people look at the rejections that were made by Ms. Heist and say, she just got that wrong, repeatedly? And a man's leg is amputated further because of it. So, with all due respect, the merits of Mr. Hardy's claims are separate from the exhaustion? True enough, which is why we've spent all this time talking about exhaustion. But in the end, there's a real human being with part of his leg missing, because of something the Department of Corrections itself, through Mr. Bell acknowledges, was a series of mistaken, incorrect rejections of grievances. Is that just kind of irrelevant in what the district court should be looking at when it's asking whether there was available grievance process here? I mean, is it so separate that they shouldn't be saying, something's going on here that maybe should have required more attention from the Department of Corrections? It may be. It may be that they're completely separate. One has nothing to do with the other. But I put it to you. Are they so separate that the district court shouldn't have been paying some attention to what the consequences of repeated mistakes by Ms. Heist were? I mean, legally, it's a separate issue that she's supposed to reach before she... Why is it so that the test is thwarting, right? And that's what the Supreme Court has. That's the category that we're looking at here, whether there's thwarting.  It's got to be clear or intentional misrepresentation, or that we can look at that in isolation. Where do you get that standard from? When we said, we talked about it being misleading in Brown. And in Ross, the Supreme Court is citing to Fifth and Seventh Circuit cases that talk about whether a prisoner is misled. Not whether it's intentional, not whether there's even an affirmative misrepresentation as opposed to an omission, but whether a prisoner is misled and thereby thwarted in efforts to access the grievance policy. Well, again, I'm going back to what the magistrate judge found when she said that she didn't think the conduct was misleading. But that's just error of law on the part of the magistrate judge to be looking for a clear misrepresentation or to suggest that that's what's required under Ross or Brown, doesn't it? Well, I think if the court thinks that the evidence shows that there was misleading conduct on her part to put it outside of the general requirements for exhaustion, then, you know, that's a different issue. And the case then should go back for her to make more definitive rulings on whether he ever received the handbook in the first place. What's our standard of review? You said earlier, oh, it's very deferential. What is our standard of review in determining whether or not the grievance process was available to this prisoner? It's some clearly erroneous. Not if we're talking about a misunderstanding of the legal test. If the magistrate thought it had to be a clear misrepresentation, but Supreme Court case law and our case law talks about whether a prisoner was misled, that's a legal test, right? Well, I think a clear error of law, you know, could fit the clearly erroneous standard. That would be plenary review. But it's more of a deference to factual findings. Right, but if she's just wrong on the law, we have de novo review, right? Yes. Okay. Can I let my co-counsel speak? Yes, thank you, Mr. Hopker. Mr. Ryan Fiore. May it please the court. Our position is consistent with the Department of Corrections. I believe that Mr. Hopker did a good job laying out our positions. I just want to say that we agree that the handbook issue is not dispositive, and that we believe that there were sufficient facts and evidence for a finding that remedies were unavailable, regardless of whether he received the handbook. Or were available. I'm sorry, were available. Thank you. Yeah, what facts are you relying on? Again, many that Mr. Hopker already pointed to. I believe that there is some onus that needs to be placed on the inmate himself in a system as large as the Department of Corrections to find out what remedies. That's all, that's a given, right? The burden is on the plaintiff to say, hey, this process wasn't available to me. Done. So what, and the facts that they're relying on are, I didn't get the handbook, ADM 804 isn't available, and I couldn't get to the library, and I was misled by a corrections officer, a counselor, Perry. Okay, that's what they're relying on. What are you relying on to say, you know what, all that doesn't matter. Assume that's all right, doesn't matter. What do you rely on that says, yeah, it was available, he knew. That there were multiple opportunities for him to find out, again, going to the fact that there's an objective aspect to this, that a reasonable inmate could have talked to one of the nearly 4,000 other inmates. You're going to take us down this road. I'm sorry, can I just hear for the record what she said? You said he should rely on the other 4,000 inmates, is that what you said? Your Honor, I was merely listing that as one example of a way that he would have had an opportunity to find out, to borrow someone's handbook, to find out about the grievance process, about the appeal aspect of it. I apologize, I just wanted to hear that. Would you and Mr. Hopkirk, if you're going to pursue this argument, be prepared to concede that Hardy did not, in fact, receive the handbook? No, Your Honor, I'm not willing to concede to that. But as Mr. Hopkirk said, we agree that should Your Honors find that the handbook is a dispositive issue, then that there therefore needs to be resolved by the District Court, then perhaps it should be remanded for further evidentiary findings on that issue. But in the end, your position is it doesn't matter, because there's 4,000 other inmates and everybody can tell them what to do. So the handbook's completely irrelevant, really. That's the view of the medical defendants. Your Honor, like I said, that's one way that this inmate could have found out more about the process. What else? Do you have something besides there's 4,000 other guys in this prison? I believe he could have made a better effort to go to the library. He could have asked more than one person about the process. Here's a question I have for you about the policy. There seems to be an inherent inconsistency in the policy that even if he had the handbook, would have created a problem. Let me be specific as to what I'm talking about. Page 41 of the appendix cites to section 1A, paragraph 15 of the grievance policy. And it states, any concern disputing initial review responses should be addressed through the appeal process. That's on the one hand. On page 42 of the appendix, paragraph 20, it says, if a grievance is rejected, the grievance may be resubmitted. Those seem to be inherently or intrinsically inconsistent. So what knowledge can we impute to the prisoner of the policy when the policy seems to be inconsistent in what it's in the message or the language it's using? Your Honor, I mean, I think that there's two different options. Of course, like you're saying that the inmate has when a grievance is rejected. And I think it just goes back to the fact that even if he didn't have the handbook, we believe that there were many ways that he could have learned about, obtained a copy of the full policy and come to understand it better. But Judge Greenway is making the point that if he had the policy, the policy tells him keep resubmitting.  And as he's doing that, he's continuing to get with different explanations, rejections. How at that point, are we talking about it being so opaque that it's unavailable or that between the way the policy is written and the information he's getting that he's thwarted? How could we say with if that's the circumstance, that there's actually any meaningful grievance process available to him? Your Honor, I believe that he could have taken because there are two options. If he kept resubmitting and that wasn't working for him, he could have taken the other route available, which was appeal. He could have wrote an inmate request to staff asking for help, asking why his grievances were being rejected. Let me ask you this. Your folks are in charge of the infirmary, right? They're running it, the medical personnel. Yes, Your Honor. The assertion is that people are not allowed to bring personal belongings into the infirmary. Is that an accurate statement? I apologize, Your Honor. I don't have an answer for that. You don't know whether that's factually accurate or not? Off the top of my head, I do not know. With your permission, I'll actually turn for just a moment to Mr. Hopkirk. Is that a factually accurate statement, Mr. Hopkirk? I don't know that either. You don't have any reason to dispute it? I have no reason to dispute it, but I don't know if it's true. If you have no reason to dispute it, I'll take that. Let's take that as a basis for this next question, then. If it is indeed the case that you're not entitled to anything with you, does it or does it not seem more likely to you that the events transpired just as Mr. Hardy said they did? He had to go straight to the infirmary. They told him, hey, just sign this. It'll be waiting for you later. But he didn't get it on that occasion because he was going straight to the infirmary. Yes, I definitely think that that's possible. But I don't think that has any bearing on whether the handbook was there in his property box, as I think he explained it when he returned. OK. All right. Is there anything else? I have nothing further. Thank you. Ms. Chavez-Freed, we'll have you on rebuttal. OK. In Ross v. Blake, the 2016 US Supreme Court case, the court outlined three scenarios which would not excuse an inmate from the exhaustion process, but rather deem him to have exhausted. He fits squarely within number two and number three, which is misrepresentation and the opaqueness of the procedures itself. The opaqueness is Tanya Heist, the grievance coordinator. The misrepresentation is he relied on that advice from his counselor to his detriment. There is case law. If we go back to the issue of the handbook, what happens to those assertions? If he got the handbook and the handbook laid out for him that appeals were available to him and he never took advantage of them, what does that do to your argument that Ms. Heist is a bad actor and that Ms. Perry is a misleader? Is he entitled to keep running his head into a brick wall if he knows, because he's got the handbook, well, there's a step you're supposed to take after you hear no from Ms. Heist? So with misrepresentation, it would destroy that argument. Absolutely. If he got that handbook, he read it, and it's not about what he knows. It's in this case, in this Supreme Court case, it's about what the prison does or doesn't do, act or omission. OK, but he's got it, and it's assumed for the sake of discussion that the handbook is clear and says, here's your process, grieve, appeal, and then a second-step appeal to the SOIG. Assume that that's what it says with clarity. Is he entitled to go ask somebody and then say, hey, I was misled, they told me to file another one, if he's got the handbook and the handbook tells him what to do? So when we're dealing with the prison population, a lot of them have difficulty with reading, but that's not dispositive here. If he receives that handbook and he doesn't understand something, so he takes it upon himself to go find his DOC counselor and say, can you explain why this is happening? And she says, you know, just do another one and send it in. That is misrepresentation. And under this case, it doesn't say clear misrepresentation or an absolute misrepresentation. It's misrepresentation that the prisoner relied on to his own detriment. Is it the case then? I mean, would you have us lay down a rule of law that says, no matter how clear a handbook is, if a prison official says something that's ill-informed, even in good faith ill-informed, the prisoner is absolved of any responsibility to attempt to read and understand the grievance process handbook that he or she's been given? Absolutely not, Your Honor. Well, that sounds like what you're arguing. The question I'm positing for you is, if he's got the handbook and the handbook's clear, what difference does it make that Ms. Perry said what she said? Well, he doesn't have the handbook, so it's hard for me to... I know. You've got to take the question as it is. So if he has the handbook and say he has an eighth grade education and he can't make heads or tails, he has a right to go to not one of the 4,000 inmates in the institution, but a DOC counselor where it says in their own ADM policy that they need to know this policy because they're involved sometimes. So yes, I guess I'll turn myself around and say you should rule that way. The other thing I want to say, just one last thing about the book. Hardy, under oath, testified in that exhaustion hearing. It was a rebuttable presumption. There was another person who signed that sheet. They didn't bring that person, even though they harped on it throughout that hearing. And they didn't put forth an affidavit or counter it in any way after the briefing. A rebuttable presumption that they chose to do nothing about. So they should accept it. Counselor, just to go back to something you said earlier, I just want to make sure you've been talking about misrepresentation and focusing on what the prison did. But you also, I take it your argument includes that a prisoner being misled under the case law, even if it's not intentional, if a prisoner is misled by the prison, that that would satisfy a court. Right? Yes. Thank you. Okay. Thanks very much. Counsel, we've got that matter under